[No. 19459. In Bank.—October 9, 1897.]

T. J. HIGGINS et al., Respondents, v. CITY OF SAN DIEGO et al, Respondents, and SAN DIEGO WATER COMPANY, Appellant.

MUNICIPAL CORPORATIONS—SUBSIDY FOR RAILROAD—ILLEGAL CONTRACT.—A municipal corporation not authorized to grant aid to a railroad cannot, directly nor indirectly, make any contract for the payment of money, where an indefinite and inseparable part of the stipulated amount is payable in consideration of the unlawful object of subsidizing a railroad.

ID.—VOID LEASE OF WATER PLANT TO CITY—CONDITION FOR BUILDING RAILROAD—EVASIVE CONTRACT—LEASE TO NOMINAL PARTIES—SUBLEASE TO CITY WITHOUT CONDITION.—A lease to a city by a water company of its entire plant for a term of years, in which the rent reserved is in part con-

sideration of a condition that the water company shall construct a railroad within a specified time, is invalid and void; and where, by an evasive contrivance, the lease containing such condition. was made to nominal parties, who, in accordance with the understanding, immediately subleased the plant to the city for the entire term, and for the full amount of rental, but without expressing such condition in the sublease, and the city was thereby induced to agree to pay, under the name of rent, the whole consideration for the undertaking of the water company to build the railroad, and thus indirectly to subsidize the railroad, the contracts of lease and sublease are wholly void from their inception.

ID.—OPTION TO TERMINATE LEASE—VOID PURCHASE BY CITY—RIGHTS OF NOMINAL LESSEES.—The city not being permitted to subsidize a railroad directly or indirectly, could not buy an option, to be exercised either by itself or by others, to ·terminate its agreement to pay rent, upon failure of the lessor to build a railroad; and although the right to terminate the agreement for failure to construct the railroad was left in the nominal lessees, it is immaterial whether that right was to be exercised in their own behalf and at their own discretion, or as trustees for the city.

ID.—CONDITION SUBSEQUENT—CONSIDERATION.—The fact that the condition for the construction of the railroad was put in the form of a condition subsequent, upon the breach of which the lease might be terminated, does not prevent the condition from forming part of the consideration for the stipulated payments of rent; but the option to terminate the lease for breach of such condition is valuable to the party paying the rent, and burdensome to the party charged with the condition, and is a good consideration for the agreement to pay the rent.

ID.—WAIVER OF CONDITION — NONPERFORMANCE—VOID CONTRACT.—The contract being void for want of power in the city to expend corporate funds in aid of the construction of a railroad, it cannot aid the contract that the city waived compliance with the condition for its construction, and it is immaterial that the railroad was never constructed or operated, or that its construction was never commenced.

ID.—VOID RESOLUTION OF COUNCIL AS TO LEASE—ABSENCE OF AUDITOR'S CERTIFICATE—NO PRESUMPTION OF AUTHORITY.—A resolution of a city ·council authorizing the mayor to execute a lease of a water plant, which had not previous to its passage been presented to the auditor as required by the city charter, and which lacked his required certificate that the contemplated indebtedness or liability could be incurred without a violation of the restrictions imposed by the charter, is fatally defective and void; nor had the water company the right to presume that the council would not have authorized the mayor to act, in violation of the charter, without the proper certificate of the auditor.

ID.—VALIDITY OF CHARTER PROVISION.—The provision of the city charter requiring the auditor's certificate is not invalid, as being an attempt to invest a ministerial officer with judicial powers and functions; but such provision is a mere restriction upon the legi·lative power of the council, requiring them to go to the best source of information for the fact upon which their right to act depends.

ID.—SUPPLY OF WATER FOR CITY—ORDINANCE REQUIRED—JOINT RESOLUTION NUGATORY.—Where the only authority conferred upon the council by the

charter to adopt and carry out means for securing a supply of water for the use of the city and its inhabitants is found in the enumeration of matters as to which the council is empowered to pass ordinances, which cannot take effect without publication, an unpublished joint resolution authorizing the mayor to lease a water plant is nugatory.

ID.—CONTRACT FOR FUTURE PAYMENT BY CITY—CASE AFFIRMED.—The case of *McBean v. Fresno*, 112 Cal. 159, affirmed as to the power of a city to make contracts *in futuro*, involving the payment of moneys annually during a long period of time, without violating the provision against indebtedness in excess of revenue, if the annual payment does not exceed the revenue for the year in which it is to be made, and also as to the conditions under which such contracts may extend beyond the term of office of the trustees who authorize it.

ID.—INVALID CONTRACT—RATIFICATION—ESTOPPEL.—Where the objection to a contract made by a city for the lease of a water plant is that it is void as involving a subsidy for a railroad, the contract is incapable of ratification, directly or indirectly, and the city cannot be estopped from denying the validity of the contract because the water company was required by the city to expend a large sum of money in extending the plant, and because the city refused to redeliver possession of the plant when demanded.

ID.—GENERAL POWER OF CITY AS TO WATER SUPPLY—LEASE OF PLANT FROM YEAR TO YEAR—REASONABLE VALUE OF USE—PROVISION AGAINST EXCESS OF REVENUE.—Although the express contract of the city to lease the water plant for a term of years at a fixed rental was invalid and void, yet as the city has the general power to contract for a water supply for itself and its inhabitants, it may lease a water plant for a year, and renew it from year to year, and it is liable to pay the reasonable value of the use of the plant actually enjoyed, provided the claim of the water company for the reasonable value of the use does not exceed the amount of unappropriated revenue for the respective fiscal years during which the city had the use of the plant; but claims for such use accruing at a time when there were no unappropriated funds to meet them are void, like other claims upon exhausted revenues, and will not warrant a judgment of any character.

ID.—FORM OF JUDGMENT FOR REASONABLE VALUE OF USE—GENERAL JUDGMENT AGAINST CITY—PROVISION AS TO PAYMENT.—A judgment for the reasonable value of the use of the water plant, after ascertaining in what years the claims of the water company for such value were not in excess of the unappropriated revenues of that year to meet them, should not be rendered so as to be payable only out of those revenues, but should be in the form of an ordinary general judgment for whatever amount shall be found due, without any direction as to the revenues out of which the judgment shall be satisfied, or any direction as to the method of its payment, for which some future provision might be made by the city, although there might be no revenues of the fiscal year in which the debt was incurred out of which it could be satisfied.

APPEAL from a judgment of the Superior Court of San Diego County.  J. W. McKinley, Judge.

The facts are stated in the opinion of the court.

Works & Works, for Appellant.

H. E. Doolittle, City Attorney, T. L. Lewis, Deputy City Attorney, William H. Fuller, and C. L. Barber, for City of San Diego and its Auditor and Treasurer, Respondents.

Luce & McDonald, for San Diego Flume Company, Respondent.

Haines & Ward, for Plaintiffs, Respondents.

THE COURT.—On a former hearing of this cause judgment in favor of the city of San Diego was reversed, with direction to the superior court to enter judgment in favor of the water company for the reasonable value of the use of its distributing plant, etc., said judgment to be payable only out of the revenue of those fiscal years during which the city held possession of the plant. A rehearing was ordered principally upon the question as to the proper form of the judgment. Upon further consideration of the case, we have reached the conclusion that the water company should have an ordinary general judgment for whatever amount shall be found due it, without any direction as to the revenues out of which the judgment shall be satisfied. The opinion rendered at the former hearing must also be modified in the other particulars hereinafter stated.

We have no desire to disturb the principle that no indebtedness or liability incurred in any one year shall be paid out of the ordinary income or revenue of any future year, which principle has been declared by a long line of decisions running from the case of *San Francisco Gas Co. v. Brickwedel,* 62 Cal. 641, to *McBean v. Fresno,* 112 Cal. 159; 53 Am. St. Rep. 191. Future provision might be made for the payment of a debt, although there might be no revenues of the fiscal year in which the debt was incurred out of which it could be satisfied—as, for instance, by the adoption by the people of a proposal to pay it, or by other methods that might possibly be suggested; and a direction in a judgment that it should be paid only out of the revenues of a certain year might be held to preclude its payment in any other way. Merely putting a demand in the form of a general

judgment would not in any way take it out of the general rule that the ordinary revenues of a future year cannot be applied to the payment of a liability in a previous year, as held in *Smith v. Broderick*, 107 Cal. 644; 48 Am. St. Rep. 167. We think, therefore, that in a case like the one at bar, there should be a general judgment in the usual form without any direction as to the method of its payment. In *Weaver v. San Francisco*, 111 Cal. 319, and in one or two other cases, where it was directed that the judgment should be satisfied out of the revenues of the fiscal year in which the services sued for were performed, the court was only considering the question whether the ordinary revenues of a fiscal year could be applied to the satisfaction of debts of a previous year; and there was not in the mind of the court the possibility of a provision for raising an extraordinary revenue by a vote of the people, or in some other way, for the express purpose of paying such debts. If that view had been suggested to the court, the judgment in those cases would undoubtedly have been a general one. At all events, we are satisfied that, for the reasons above suggested, the judgment in such a case should be general and without any restriction that might embarrass future action.

Our former opinion is also modified so far as it may seem in any of its expressions to go beyond the decision in *McBean v. Fresno, supra,* upon the question of the validity of a contract of a municipal corporation extending over a series of years beyond the term of office of the trustees who authorize it.

Our former opinion is also modified as follows: We cannot direct the superior court to enter a judgment upon the findings for the reasonable value to the city of the water company's plant and of the water supplied, because it does not appear that the claims of the water company all accrued at a time when there were unappropriated revenues to meet them, and it will be necessary for the court to ascertain as the basis of its judgment against the city just when the claims of the water company for reasonable value of use, etc., equaled the amount of unappropriated revenues for the respective fiscal years during which the city had the use of the water company's plant. Claims for use of plant and value of water supplied after such time are like other claims upon exhausted revenues; they are void, and will not warrant a judgment of any character.

In all other respects our former opinion is readopted.

The judgment of the superior court is reversed, and the cause remanded for further proceedings in accordance with our former opinion as herein modified.

HARRISON, J., concurring.—Upon the former decision in this case I dissented from the conclusion reached by a majority of the court, upon grounds not involving the form of the judgment to be entered. The form of judgment then directed was in accordance with the directions of this court in the case of *Weaver v. San Francisco,* 111 Cal. 319, in which I participated. As is very pertinently observed in the foregoing opinion, the only question then before the court was the right to divert the revenues of one fiscal year to the payment of liabilities incurred during a preceding fiscal year. It was not intended to hold, and there is no reason for holding, that, if at any future time the municipality shall by any legal mode assume the payment of such liabilities, it cannot be enforced out of the funds thus provided for their payment, since in that case the assumption of the liability would form the basis of a new obligation which would not be limited or affected by the previous judgment. But, as in any attempt to enforce a judgment against a municipality, the municipality would have the right to show in what year the obligation upon which the judgment was rendered was incurred, and to insist that it should not be collected out of the ordinary revenues of any succeeding year, the form in which the judgment is entered is not material to the rights of the parties, but is only a matter of convenience, and may be varied according to the nature of the action. I therefore concur in the foregoing opinion to the extent that it gives directions as to the form in which the judgment should be entered, and I also concur in the other respects in which the former opinion is modified.

BEATTY, C. J., concurring.—On a former hearing of this cause, the judgment in favor of the city of San Diego was reversed, with directions to the superior court to enter judgment in favor of the water company for the reasonable value of the use of its distributing plant, etc., said judgment to be made payable only out of the revenues of those fiscal years during

CXVIII. CAL.—34

which the city held possession of the plant. The direction that the judgment should be entered in this specific form was based upon the decision of Department One of this court in *Weaver v. San Francisco*, 111 Cal. 319, and the apparent acceptance of the doctrine of that case by Department Two in *McBean v. Fresno*, 112 Cal. 159; 53 Am. St. Rep. 191.

But both of these cases were decided after the submission of this case, and the question of the form of the judgment had not been raised or argued by counsel for these parties. For that reason a rehearing was granted, in order that the whole matter might be reconsidered in the light of fuller argument before the court in Bank should commit itself to a final decision upon a proposition so important in its consequences.

What we have to decide is the proper application of section 18 of article XI of the constitution to a case like this: A city has an income and revenue provided for the ensuing fiscal year amounting to one hundred thousand dollars over and above all fixed charges, such as salaries of officers established by law. At the beginning of the year it enters into a contract for the construction of some needed public work and agrees to pay therefor on completion fifty thousand dollars. The contract is not only valid but is fair and honest, and has been awarded under open competition to the lowest responsible bidder, at a price which will enable him to make only a reasonable profit. The contractor has done everything that prudence and good faith could possibly demand, and he proceeds at large outlay and expense to the faithful performance of his agreement. But it requires the whole year for the completion of his contract, and before his claim for compensation can mature or be presented for allowance the city has entered into other contracts and incurred other liabilities, for which it has expended the whole revenues of the fiscal year, and its treasury is completely bare. Our contractor, under these circumstances, presents his claim and it is duly allowed, but he can get no warrant from the auditor, and if he could the treasurer would not be able to pay it. He sues the city, and there is no defense except that the money which should have been reserved for the payment of his claim has been misappropriated to the payment of claims that were invalid. Must he then be content with a judgment payable only out of the exhausted revenues of the year in which

his contract was made and performed? Must he, in other words, be content to receive nothing merely because the funds to which he was justly entitled have been illegally misapplied?

The question before us is, whether section 18 of article XI of the constitution leads to such results. That section reads as follows: "No county, city, town, township, board of education, or school district shall incur any indebtedness or liability, in any manner or for any purpose, exceeding in any year the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof on or before maturity, which shall not exceed forty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void."

The case of *Weaver v. San Francisco, supra,* was not decided exclusively upon this section of the constitution, but was rested, in part at least, upon certain provisions of the charter of San Francisco, which, however, are in the same line and designed to enforce the same policy. Similar provisions of the charter of San Diego have been cited in this case. The meaning of all these provisions in the various municipal charters and in the constitution seems to be too plain for any possible misunderstanding, and is simply this: that a county, city, town, etc., may make valid contracts and incur binding liabilities only to the extent of the revenue provided in advance for their discharge. Such contracts and such only are valid, all others are utterly void. Nothing is said as to the application of each year's revenues, but it is plainly implied that they are to be used for the purpose of discharging valid obligations, and must not be misapplied to the payment of invalid claims.

Unfortunately, however, the proper course plainly indicated by the constitution is not invariably followed. A city, as in the case above supposed, after entering into a valid contract involving a liability not in excess of the revenues provided for its discharge, expends all of its available funds in payment of claims which are of no obligation because they are based upon subse-

quent contracts, which are void, for the reason that they involve liabilities which, added to those previously and lawfully incurred, exceed the revenues provided for the year. Such apparently is the case here, and such was the case of *Weaver v. San Francisco, supra,* in which the court used the following language, which was afterward quoted approvingly in *McBean v. Fresno, supra:*

"Whoever deals with a municipality does so with notice of the limitation of its powers, and with notice also that he can receive compensation for his labor and materials only from the revenues and income previously provided for the fiscal year during which his labor and materials are furnished; and with the knowledge, too, that all other persons dealing with the municipality have the same rights to compensation, and are subject to the same limitations as he is. Even though at the time of making his contract there are funds in the treasury sufficient to meet the amount of his claim, he is charged with notice that these funds are liable to be paid out for municipal expenditures before his contract can mature into a claim against the city; and if others whose claims have accrued subsequent to his are able to intercept these funds, he is in the same condition as any creditor who has dealt with one whose assets are exhausted before he presents his claim. He acquires no claim in the nature of a lien upon these funds for the amount of his demand, nor is there any legal obligation upon the municipality any more than upon any other debtor to pay the claims against it in the order in which they are incurred, unless they are presented in that order and in such condition and with such formalities as entitle the claimant to immediate payment. In dealing with the municipality he must rely upon the integrity of its officers that they will not incur any liabilities during the year in excess of the income and revenues provided for that year, and, as a prudent man, he will ascertain not only the amount of that income, but also the amount of the claims already existing and of those that are likely to be incurred."

This language is, in my opinion, too broad and sweeping, and sets forth a doctrine which cannot be deduced from the constitution. I concede that one who deals with a city is charged with notice of the limitations upon its powers, and that he can be compensated for his labor and materials only out of the in-

come and revenue previously provided; and, also, that he must know that all other persons stand upon the same footing. But I cannot admit that he is charged with notice that the city will violate its charter and the constitution by expending the funds properly applicable to the payment of his valid claim in the payment of claims founded on subsequent contracts which are void for the very reason that the unappropriated revenues of the city are not sufficient to meet them. I do not admit that others whose claims have accrued subsequently to his can lawfully intercept any money necessary to discharge his claim. They may do it in fact—as in the Weaver case—and he may find himself practically in the same condition as any creditor who has dealt with one whose assets are exhausted before he presents his claim, but he is in that condition not because the constitution intended such a result, but only because the city has violated the constitution in misapplying the funds to which he was first entitled. True, he has no lien upon the funds, because they are not under his control, but this is no answer to the justice of his claim, and only makes it more sacredly the duty of the city to protect him in a right which he cannot himself protect.

And I insist that there is a legal and constitutional obligation resting upon the municipality different from that which rests upon any other debtor in this respect. An ordinary debtor may incur obligations in excess of his ability to pay, and he may pay them in such order as he chooses. But a city cannot incur valid obligations to pay any more than its revenue already provided will enable it to pay. The moment it oversteps that mark its contracts cease to be valid, and it cannot pay the claims founded upon such invalid contracts. It is under a legal obligation not to pay them. But its legal and valid obligations—that is to say, all of its obligations first incurred up to the amount of its revenues—it must pay, and as to these, of course, it is a matter of indifference in what order they are paid, if they are all paid in full, as they necessarily must be if no part of the revenues is misapplied, embezzled, or lost. But it is far from being a matter of indifference if invalid claims founded upon void contracts are paid before valid claims can mature.

Nor do I think that one dealing with a municipality must rely upon the integrity of its officers, that they will not incur

liabilities during the year in excess of the income and liabilities provided for that year. He has something better to rely upon, viz., this very section of the constitution which we are considering, and which puts it out of the power of the officers to incur any liability in excess of such income and revenues. In entering into any contract he is bound to ascertain how far the revenues have been appropriated to existing liabilities, but he is not bound to anticipate, and no amount of prescience or foresight could enable him to anticipate, what illegal claims would be incurred by officers willing to violate the city charter and the constitution.

For these reasons I find myself unable to accept the doctrine of *Weaver v. San Francisco, supra,* and the conclusion deduced from it, that in cases of this kind the judgment must be made payable only out of the revenues of a particular year or years. I think, on the contrary, that in such actions the sole question is whether there is a valid obligation. If there is, the plaintiff should have judgment in the ordinary form, and there will be no difficulty about paying it if the funds properly applicable to its payment have been neither misapplied, embezzled, nor lost. If they have been misapplied, embezzled, or lost, the city should not be allowed to allege its own misconduct as a reason for limiting its creditor to a judgment which will be fruitless.

In determining the validity of the obligation, it will, of course, always be necessary to inquire whether at the date of its assumption there were unappropriated revenues to meet it, because if there were not, there will be no liability resting upon the city, and the claimant will have no right to a judgment in any form.

But if at the time the contract was made, there were unappropriated revenues to meet it, in whole or in part, the claimant will be entitled to a judgment for the amount of his claim, or such part of it as the funds applicable to its payment will cover.

If this were a new question, unembarrassed by any previous decisions of the court, the views above expressed would, it seems to me, meet with unhesitating acceptance. But it is not a new question and was not entirely new when *Weaver v. San Francisco, supra,* was decided; for in that case the court seems to have felt itself constrained by previous decisions, which were understood as establishing the doctrine there announced. I think, however, that nothing had been previously decided which

went to the extent of the Weaver case, although some of the opinions may contain *dicta* which point in that direction.

The first case in which section 18, of article XI, of the constitution, came to be considered was *San Francisco Gas Co. v. Brickwedel*, 62 Cal. 641. That was a proceeding by *mandamus* against the auditor of San Francisco to compel him to draw his warrant for the amount of a claim for gas furnished to the city and county. The case does not show in what year the gas was furnished or out of what year's revenue payment was demanded, nor does it show whether at the time it was supplied there were any unappropriated revenues of the current year applicable to the payment. Apparently, however, the case was sent to the superior court to have these or some of these questions determined, and, in the course of a short opinion stating the reasons for making that order, Judge Ross, referring to section 18, of article XI, said that the framers of the constitution meant that "each year's income and revenue must pay each year's indebtedness and liability, and that no indebtedness or liability incurred in any one year shall be paid out of the income or revenue of any future year." So far as we can see from the report of that case this was mere *dictum*, but properly understood it undoubtedly states the real intention of the framers of the constitution. They did intend that each year's revenue should pay each year's expenses, and that no claims upon one year's revenues should be made a charge upon the revenues of future years.

But how did they propose to accomplish that object? The words of the constitution answer: by making all obligations contracted in excess of the revenues void and unenforceable, not by making valid obligations unenforceable merely because the city revenues have been exhausted in payment of claims which the constitution declares void. If the behests of the constitution are obeyed in this matter, the object of its framers will be attained, for the extent of the legal obligation of a city is exactly measured by the amount of its revenues, and, if the revenues of one year are properly expended, there can be no valid claim carried over against the revenues of a succeeding year. If, however, the constitution is deliberately or recklessly violated, it cannot be a matter of surprise if consequences follow that were not in the contemplation of its framers, and those who

have caused the difficulty ought to be the last to complain of it.

From what has been said it is clear that the *dictum* of Judge Ross in the Brickwedel case went no further than to declare the true intention of the framers of the constitution. What consequences would follow from disregard of the provision which was designed to carry out that intention was a question not involved in that case, and of course not decided.

It is further to be observed of this case, as of the cases in which it was followed (*Shaw v. Statler,* 74 Cal. 258, *Schwartz v. Wilson,* 75 Cal. 502, *Smith v. Broderick,* 107 Cal. 644, 48 Am. St. Rep. 167, *McGowan v. Ford,* 107 Cal. 177), that they were each and all of them proceedings by *mandamus* against the auditor or treasurer to compel the drawing or payment of warrants against or out of a particular fund, and the sole question involved was whether it was the legal duty of those officers to pay demands upon the revenues of one fiscal year out of the revenues of another fiscal year. It may be conceded that those decisions have conclusively established the proposition that it is not the legal duty of those officers to make such payment. And the case of *Smith v. Broderick, supra,* establishes the further proposition that a consent judgment based upon an illegal demand will not authorize payment out of the proceeds of a special tax levied for the express purpose of paying it. But the question here is, whether the holder of a legal and valid claim shall have a plain and ordinary judgment establishing his right. The question whether any means of paying such judgment can be lawfully provided is not necessarily involved, but when that question arises, if it ever does, the case will be widely different from that of *Smith v. Broderick, supra.* There will be the difference, that is to say, between the effect of a judgment establishing a valid claim which is the result of a *bona fide* contest in a court of competent jurisdiction, and a mere confession of judgment upon an invalid claim.

If the views above stated are correct, it has been shown that prior to *Weaver v. San Francisco, supra,* nothing has been decided by this court which sustains the doctrine of that case, and it is not sustained by the constitution.

In *McBean v. Fresno, supra,* the question as to the form of judgment in such cases was not involved, and the opinion in

*Weaver v. San Francisco, supra,* was merely quoted *arguendo* upon another point.

The case of *Bradford v. San Francisco,* 112 Cal. 537, was correctly decided, but it has no bearing on this case.

The result of this discussion is, that our former judgment must be modified so far as it directs the future proceedings in the superior court. We cannot direct the superior court to enter a judgment upon the findings for the reasonable value to the city of the use of the water company's plant and of the water supplied, because it does not appear that the claims of the water company all accrued at a time when there were unappropriated revenues to meet them, and it will be necessary for the court to ascertain as the basis of its judgment against the city just when the claims of the water company for reasonable value of use, etc., equaled the amount of unappropriated revenues for the respective fiscal years during which the city had the use of the water company's plant. Claims for use of plant and value of water supplied after such times are, like other claims upon exhausted revenues, void, and will not warrant a judgment of any character.

We wish also to qualify our former opinion so far as it may seem in any of its expressions to go beyond the decision in *McBean v. Fresno, supra,* upon the question of the validity of a judgment of a municipal corporation extending over series of years beyond the term of office of the trustees who authorize it. In all other respects our former opinion is readopted.

Temple, J., concurred.

The following is the opinion rendered on the former hearing by the court in Bank, July 25, 1896:

BEATTY, C. J.—This appeal presents another phase of the varied litigation that has arisen out of the several contracts discussed in the two cases of *San Diego Water Co. v. San Diego Flume Co.,* reported in 100 Cal. 43, and 108 Cal. 549. A portion of the transactions out of which the present controversy arises is very fully stated in the opinions delivered in those cases, but, for the sake of clearness, it will be necessary to restate the same matters here at least in outline, and to present some others in fuller detail.

The San Diego Flume Company and the San Diego Water Company are California corporations organized for the purpose, among others, of furnishing water to the city of San Diego and its inhabitants. The flume company was owner of a water supply and a system of pipes by which it brought water to the city limits, but had no distributing system within the city. The water company had pipes laid throughout the city and all the necessary facilities for distributing water to consumers. This being the case, on November 6, 1890, the two companies entered into an agreement in writing by which the water company was constituted the sole agent of the flume company for the sale of its water to consumers within the city. Under and in pursuance of this contract, the pipes of the two systems were connected at the city limits, and the water company commenced to sell the water supplied by the flume company, and to deliver the same through its distributing system to consumers within the city, and so continued to do until the first day of June, 1891, when its entire distributing plant was turned over to the city of San Diego under a contract, the validity of which is the principal question involved in this appeal.

In form, this contract was a lease from the water company to Bryant Howard and four other citizens of San Diego, and a sublease from them to the city of the entire plant of the water company, with a daily supply of three million gallons of water from the flume company, for the term of twenty years from and after June 1, 1891, at a monthly rental of nine thousand one hundred and sixty-six dollars and sixty-five cents. The lease from the water company to Howard and others was dated April 13th, and their sublease to the city April 18, 1891, but the court finds that both were executed on the 18th, and that "the said lease of said water plant and the sublease thereof constitute a single contract, which was intended to be a lease of said water plant from said water company to said city; that said Bryant Howard and his associates were not interested in said lease from said water company to them, or in said sublease from them to said city, nor was it intended by any of the parties thereto that they should have any interest therein. They were nominal parties only, and their names were used for the sole purpose of effecting a lease of said water plant from said water company to said city and to avoid making said lease direct from

the water company to the city. It was intended and agreed that the said Howard and associates should not be under any liability of any nature, and also that the lease to them should be null and void if the city did not consent to receive from them a transfer or sublease thereof." These facts in regard to the lease and sublease are not only found by the court, but they are clearly evident from the terms of the instruments themselves, which are fully set out in the record, and are confirmed by the fact that the sublease, with the covenants of the city for payment, etc., was immediately assigned by Howard and others to the water company, by which means the city became directly liable to that corporation, if the contract was valid, for the stipulated monthly payments.

In pursuance of this agreement, the water company, on the first day of June, 1891, delivered its water plant to the city, and from that time until after the commencement of this action supplied to its mains so much of the flume company's water as the city required for the use of itself and its inhabitants. From the time it took possession of the plant the city collected the dues of water consumers, so far as they were collected, and with the exception of two months it regularly allowed and approved the bills of the water company for the monthly rental of nine thousand one hundred and sixty-six dollars and sixty-five cents. It also applied to the payment of these bills the moneys collected from water rates less the cost of collection and management. But the payments so made fell far short of the stipulated rent—that is to say, when the rent due according to the terms of the lease amounted in round numbers to two hundred thousand dollars, but ninety thousand dollars had been paid, leaving one hundred and ten thousand dollars still due. And this deficiency was caused in great part by the action of the city authorities in reducing water rates to an unreasonably low figure after obtaining possession of the distributing plant, and by neglecting to collect the rates so reduced.

Such being the situation, the plaintiffs Higgins and Llewelyn, taxpayers of San Diego, in September, 1892, in behalf of themselves and other taxpayers of the city, commenced this action to obtain a decree declaring the lease to the city void, and enjoining the city and its auditor and treasurer from allowing and paying any further claims for rent. The defendants named

in the complaint were the city of San Diego, its treasurer and auditor, Bryant Howard and his associates, the flume company and the water company. Of these defendants only the city, the auditor and treasurer and the water company answered the complaint, and these answers, owing to the subsequent action of the plaintiffs in dismissing their action, will not call for further consideration. The water company, in addition to its answer to the complaint, filed a cross-complaint against its codefendants, the city and its auditor and treasurer. In the first count of its cross-complaint the water company alleged the making of the lease and sublease and the assignment of the latter to itself, its full compliance with all the covenants on its part to be performed, and the failure of the city and its officers to pay the stipulated rent—counting, in other words, upon the written contract. The second count of the cross-complaint was upon a *quantum valebat* for the reasonable value of the use of its plant during the time it had been held and used by the city. The third count was for damages for the unlawful withholding of the plant by the city after demand for its return. To this cross-complaint the city and its auditor and treasurer made answer asserting the invalidity of the lease and sublease upon all the grounds suggested by the plaintiffs and upon other grounds, and defending against the claims for value of the use and for damages. Upon the filing of this answer to the cross-complaint, the original plaintiffs dismissed their action, leaving the contest to be waged between the water company on one side and the city and its officers on the other.

The cause was tried by the court and very full findings made, upon which the court concluded that the water company had no right to recover upon either count in its cross-complaint, and judgment was entered accordingly. From the judgment so entered the water company appeals, contending that, upon the facts found by the court and admitted by the pleadings, the judgment should have been in its favor.

The main question in the case is as to the validity of the written contract between the city and the water company, and this involves an inquiry into the capacity and powers of the respective parties to the contract, the terms of the written instruments and the objects of the transaction.

As to the powers and capacities of the parties: The San Di-

ego Water Company is and then was a corporation organized under the laws of the state of California for the purposes, among others, of supplying, furnishing, and selling water to the city of San Diego and its inhabitants for domestic purposes, and to acquire, by purchase or otherwise, the rights, franchises, works, and equipments, and the real and personal property of other persons and corporations   supplying, or authorized to supply, water for said purposes, and to use, control, sell, convey, or lease all such property.   The San Diego Flume Company was also a California corporation, organized for the purposes, among others, of diverting water from the San Diego and other rivers and conveying the same by means of aqueducts to the city of San Diego and other places for sale for domestic purposes, irrigation, etc.

The city of San Diego is a municipal corporation of the state of California, organized under a freeholders' charter ratified by the legislature March 16, 1889.   (Stats. 1889, p. 643.)

The general features of the lease from the water company to Bryant Howard and others have been sufficiently indicated, but it is necessary here to state more in detail some of its conditions. After providing for the lease of the distributing plant, the sale of three million gallons daily of the flume company's water, and so much more as the city may require, at the rate of five cents per thousand gallons, the payment of the rent, the assignment of the lease to the city and the immunity of the lessees from any personal liability for the rent, the agreement proceeds as follows:

"This lease is made and executed and the amount above agreed to be paid by the parties of the second part on the following conditions, stipulations, and agreements, viz." (except as indicated by quotation marks the substance only of these stipulations is given):

5. That the party of the first part do cause a railroad to be constructed and operated from the city of San Diego to San Quintin in Mexico, or to Fort Yuma in California; work to be commenced thereon within thirty days, and fifty miles of road to be completed and in operation within one year. Sixty-five miles per annum to be thereafter constructed, road to be American standard gauge, well constructed, and, after completion of

first fifty miles, daily and continuously operated for accommodation of freight and passengers.

"7. It is further agreed that should any extensions of the pipe lines or plants of the party of the first part be necessary, during the term of this lease, the parties of the second part or their assigns or sublessee shall have the option to put in such extension, the same to be of the kind and quality now being put in and used by the said party of the first part, or said parties of the second part, or their assigns or sublessee may require such extensions to be made by the party of the first part, in which case the party of the first part shall be allowed for the amount actually invested in such extension the sum of six per centum (6 per cent) per annum, interest payable at the time of paying the monthly amounts called for by this lease; and in case said party of the first part shall fail or refuse to make such extensions when required so to do by the parties of the second part, then the second party may cause such necessary extensions to be made, and deduct the cost thereof from the subsequent rentals falling due."

8. The party of the first part agrees to keep in good repair and look after and care for its plant free of expense to the parties of the second part, etc.

"10. It is also agreed that the parties of the second part, or their assignee or sublessee, shall pay to the party of the first part, for the deterioration of the extension of the pipe lines, or any part of the system, three per centum (3 per cent) per annum on the cost of such extensions; said parties of the second part to have the option of purchasing such extensions and the entire plant at any time during the term of this lease, at the actual first cost thereof to the party of the first part, less the amount paid for deterioration."

"12. And it is expressly understood and agreed that the parties of the second part have the option to terminate this lease, in case any of the conditions, stipulations, or agreements above mentioned shall not be complied with, by giving notice of such option to the party of the first part of one month, and upon returning to the party of the first part, in as good condition as when this lease is executed, ordinary wear and tear and damages of the elements excepted, of the property above described; or, in case of failure to return any part or piece thereof, to pay

said party of the first part the value of all property not returned as aforesaid, and from the time of such notice and surrender the party of the first part shall be restored to all the rights and privileges it now has."

On the same day that this lease was executed—April 18,1891 —Douglass Gunn, as mayor of the city, signed the name of the city to the sublease, which was also signed and delivered by Bryant Howard and others. The sublease, after reciting the execution and substance of the lease, and referring to the conditions upon which it might be terminated, and providing that in case of its termination the sublease itself shall terminate and all parties be freed from liability thereunder, is in its terms a substantial repetition of the lease itself down to the clause providing for the construction of the railroad which is wholly omitted. The ensuing stipulations of the lease as to repairs, extensions, care of plant, interest on costs of extensions, allowance for deterioration, etc., are repeated in the sublease, which concludes as follows:

"And it is expressly understood and agreed that the party of the second part has the option to terminate this lease, in case any of the conditions, stipulations, or agreements above mentioned shall not be complied with, by giving notice of such option to the parties of the first part of one (1) month, and upon returning to the parties of the first part in as good condition as when this lease is executed, ordinary wear and tear and damages by the elements excepted, of the property above described; or, in the case of a failure to return any part or piece thereof, to pay said parties of the first part the value of all property not returned as aforesaid; and from the time of such notice and surrender the parties of the first part shall be restored to all of the rights and privileges they now have; and in the case of the termination of this contract the first parties shall be released from all liability for damages or otherwise by reason of such termination or failure of conditions, terms, or agreements."

The foregoing full statement of certain features of the lease and sublease has been made in view of the contention of counsel for respondent that the manifest purpose of the whole transaction between the water company, Howard and his associates, and the officers of the city, was to accomplish by indirection what could not be done openly and directly, viz., to secure a sub-

sidy from the city or a loan of its credit in aid of the construction of a railroad.

This, however, is not the sole or principal objection to the validity of the contract, and is not the ground upon which the superior court held it invalid. It appears from an opinion of the judge of the superior court, printed as an appendix to one of the briefs, that his conclusion was based upon the provisions of section 18, article XI, of the constitution, and certain provisions of the charter of San Diego. Section 18, article XI, of the constitution reads as follows: "No county, city, town, township, board of education, or school district shall incur any indebtedness or liability in any manner, or for any purpose, exceeding in any year the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void."

Section 11, article 2, chapter 2, of the city charter (Stats. 1889, p. 658), provides: "No expenditure, debt, or liability shall be made, contracted, or incurred during any fiscal year that cannot be paid out of the revenues provided for such fiscal year. Except as otherwise authorized by this charter, the city shall not, nor shall the common council, the board of education, or any board, department, or officer incur any indebtedness or liability in any manner, or for any purpose exceeding in any year the income and revenue provided for it for such fiscal year. All contracts, indebtedness, or liabilities incurred contrary to the provisions of this section shall be void, and shall not be paid out of the treasury, or constitute or be the foundation of any claim, demand, or liability, legal or equitable, against said city. The words "expenditure," "indebtedness," and "liability" herein used shall include official salaries and the pay of all employés of said city, or of any of its departments."

Chapter 2 of article 6 provides for the contracting of bonded indebtedness, and in section 12 (p. 709) reiterates in more em-

phatic terms the inhibitions quoted from article 2, respecting
unsecured or floating indebtedness, and declares that "all offi-
cers of said city are charged with notice of the condition of the
city treasury and extent of the claims against the same."

Section 14, article 2, chapter 2, of the charter (p. 659) provides:
"All ordinances or resolutions appropriating money or for the
incurring of indebtedness or liability against the treasurer, in-
troduced in either board of the common council, or in the board
of education, or other department or authority, must, before be-
ing passed, be presented to the auditor, and until he certifies in
writing upon such ordinance or resolution that such appropria-
tion can be made or indebtedness incurred without the violation
of any of the provisions of this charter, no further action shall
be had upon the same."

The findings in relation to these matters are that the reso-
lution authorizing the mayor to execute the sublease in behalf
of the city was passed by the council without obtaining or re-
questing the certificate of the auditor as provided in the section
last quoted, and "that the debt and liability attempted to be
incurred by the said city by said lease and sublease, the sum of
one hundred and ten thousand dollars per year, could not at the
date of said instruments, or at any other time since, be paid out
of the revenues of the said city provided for the fiscal year then
current, or any fiscal year since the date of said instruments; nor
was any provision made for the collection of an annual tax to
pay the interest of said indebtedness or to constitute a sinking
fund for the payment of the principal. And no election was
called or held at which the electors of said city voted upon the
question of incurring said liability or consented thereto."

For these reasons, and for these alone, the contract was held
invalid by the learned judge of the superior court. As to the
other objection above stated he says in the opinion referred to:
"While it is very evident from the terms of the contract that
the hope that a railroad would be constructed was one of the
moving causes for the city authorities entering into the contract,
it was not in my opinion a consideration of the contract, but
merely a condition subsequent which falls because invalid, with-
out affecting the other provisions of the contract." And in his
conclusions of law he holds: "That said lease and sublease were

CXVIII. CAL.—35

not void because the amount agreed to be paid was a subsidy to or in aid of the construction of a railroad."

These conclusions are based upon findings to the effect that the city waived the construction of the railroad, and that neither the city, nor its mayor acting in its behalf, was induced to enter into the contract by any promises or representations of the officers or agents of the water company that the railroad would be built.

For all these reasons counsel for appellant assumes that this particular objection to the contract is wholly eliminated from the case, and that the appeal must be determined upon other grounds. Counsel for respondents, on the other hand, insists that the conclusions of the judge of the superior court as to this matter are at variance with his findings of fact, and that the findings must control. He contends, in other words, that considering the character and situation of the parties, the terms of their agreements, the circumstances under which these were entered into, and the purposes of the transaction, as found by the superior court, this court cannot avoid seeing and declaring as matter of law that a part of the consideration for the nine thousand one hundred and sixty-six dollars and sixty-five cents, which the city promised to pay monthly, was the agreement of the water company to cause the construction of a railroad.

These propositions require consideration, and, in considering them, it will be assumed, for the purposes of the discussion, that the contract of the city was entirely free from any objections except those founded upon the condition in the lease to Howard and others, as to the construction of the road. It is claimed by counsel for respondent, and seems to be conceded by counsel for appellant, that a contract by a municipal corporation of California to pay money to any person or corporation to secure the construction of a railroad would be void because in violation of section 31 of article IV of the constitution, which reads as follows:

"The legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the state, or of any county, city and county, city, township, or other political corporation or subdivision of the state now existing, or that may be hereafter established, in aid of or to any person, association, or corporation, whether municipal or otherwise, or to pledge

the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever; nor shall it have power to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever; provided that nothing in this section shall prevent the legislature granting aid pursuant to section 22 of this article; and it shall not have power to authorize the state, or any political subdivision thereof, to subscribe for stock, or to become a stockholder in any corporation whatever."

It does not seem entirely clear that such a contract would come within the strict terms of this provision, but certainly it would involve, in part at least, the evils which the constitutional restriction was designed to prevent, because it would afford a ready means of accomplishing by indirection what could not be done openly and avowedly. It is not necessary, however, to decide this question here, for there is no suggestion that the charter of San Diego confers authority upon the common council to expend any portion of the municipal funds in constructing or aiding the construction of railroads; and, in the absence of such authority, an agreement of the character supposed would necessarily be invalid.

This brings us to the question whether the city made or attempted to make such an agreement, or whether the other parties to the transaction managed to secure the advantages of such an agreement by means of the elaborate contrivance to which they resorted.

The solution of this question may be simplified by considering what would have been the consequence if a lease from the water company directly to the city had been executed in the same terms as those contained in the lease from the company to Bryant Howard and associates.

In such case it seems clear that the agreement of the city to pay the so-called rent would have been wholly void, because an indefinite and inseparable part of the stipulated amount would have been payable in consideration of the unlawful object of subsidizing the railroad. And it is no answer to this proposition to say that the provision for the construction of the road was a condition subsequent and void, or that it was waived by the city. If the city had no power to expend corporate funds in

aid of the construction of a railroad, it does not help a contract, based in part upon such unlawful consideration, to show that the city waived compliance with that part of the undertaking of the water company. The vice of such a contract consists in the attempted misapplication of the public funds, and is not cured, but is rather aggravated, by foregoing the advantages bargained for. If a city could not be compelled to pay for a railroad actually built on the faith of its promise to pay, still less could it be compelled to pay for a road not built.

But if we have mistaken the position of appellant, and the argument of counsel goes to the extent of claiming that, because the provision for the construction of the railroad was put in the form of a condition subsequent, it therefore constituted no part of the consideration for the stipulated payments, we can only say that the position is untenable. The option to terminate a contract calling for the monthly payment of large sums of money is certainly valuable to the party charged with such payments, and burdensome to the party against whom it may be exercised, unless he performs some onerous condition. It is, therefore, a good consideration for an agreement to pay money. And if the option is valuable, the condition upon which it may be exercised is equally valuable to the party who is to pay, and burdensome to the party who is to receive payment.

We conclude, for these reasons, that if this had been a lease direct from the water company to the city, it would have been rendered wholly void by the railroad clause. But, in form at least, it was a lease to Howard & Co., and a sublease to the city, and it remains to consider the effect of the elimination of the railroad clause in the sublease.

If the transaction had been in fact what it was in form, this part of the case would have presented no difficulty. There could have been no objection to Bryant Howard, or any citizen of San Diego, stipulating for the construction of a railroad in connection with a lease of the water plant and sale of a water supply. And they, having obtained such a contract, might lawfully have sublet the water plant and water supply to the city in consideration of any agreement on the part of the city which its officers were authorized to make.

But, as we have seen, the transaction was not in fact what it formally assumed to be. It sufficiently appears from the instru-

ments themselves, but more plainly and certainly from the findings of the court, that the whole object of the parties was to effect a lease of the distributing plant and water supply to the city, and that Bryant Howard and others were made formal parties for the single purpose of avoiding a lease direct from the water company to the city. But why this desire to avoid making the lease direct? If the water company had the right and power to lease its plant and water supply to Howard & Co., it had the same right and power to lease to the city, and if the city could agree for a sublease from Howard & Co., it could equally well agree for a lease from the owner of the plant.

There is but one conceivable motive, therefore, for the circuitous course pursued. The parties to the transaction evidently understood that a lease direct to the city with the railroad clause included would be void, but felt that such provision was necessary in order to induce the city authorities to enter into the agreement. This, however, is a conclusion, not of law, but of fact, and cannot be assumed by this court as the basis of its decision in the absence of a finding by the superior court, and, in view of the finding to the effect that the city was not induced to enter into the agreement by any representations that a railroad would be built, the motives and purposes of the water company and its agents become immaterial. The city, according to the findings, was entirely willing to take a lease of the water plant and water supply and pay the rent, irrespective of any condition for the construction of a road, and in making the agreement the members of the common council were wholly uninfluenced by the lure which the water company took such unnecessary pains to hold out to those interested in the growth and expansion of the city.

This being so, the validity of the contract depends upon the true construction and legal effect of the writings in which it is embodied.

As to this, our conclusions may be very briefly stated. They are that the city acquired by the sublease all the rights secured to Bryant Howard, and others, by the original lease, excepting only the right to terminate the agreement for failure to construct the railroad. This, in our opinion, remained in Howard and his associates. But whether, under the circumstances, it remained in them to be exercised in their own behalf and at

their own discretion is not so clear. It may be that they held it as mere trustees for the benefit of the city which, by their contrivance, had been induced to pay, or agreed to pay, the whole consideration upon which it was granted. It makes no difference, however, whether they held this right for their own benefit or for the benefit of the city. In either case it remains undisputed that the city by the connivance of the Water Company and Howard & Co. had been induced to agree to pay, under the name of rent, the whole consideration for the undertaking, such as it was, to build the railroad. This vice, inherent in the contract from its inception, rendered it wholly void. For we have shown that if the original lease, with the railroad clause, had been made directly to the city, it would have been void, not because there is anything unlawful in an agreement for the construction of a railroad, but because it was unlawful to use the revenues of the city to subsidize a railroad, and if this could not be done directly it could not be done indirectly, as was here attempted. If the city could not use its revenues to subsidize a railroad, it could not use them to buy an option to terminate its agreement to pay rent under a lease otherwise valid if its lessor failed to build a railroad. If it could not buy such an option to be exercised by itself it could not buy it for trustees, and still less for strangers.

If these conclusions are correct, it seems unnecessary to advert to the fact that the water company never operated or constructed the railroad, or, so far as appears, ever commenced its construction. The contract being void, the question whether it was performed or not becomes as immaterial as the fact found by the superior court that the condition for building the railroad was waived by the city.

It seems also to be unnecessary to discuss at length the various remaining objections to the validity of the contract, but they will be briefly noticed.

The first of the grounds upon which the superior court held the contract invalid was that the resolution of the council, authorizing the mayor to execute the sublease, was fatally defective, because previous to its passage it had not been presented to the auditor, and lacked his certificate that the contemplated indebtedness or liability could be incurred without a violation of the restrictions imposed by the charter. This defect in the pro-

ceedings is conceded, but the appellant contends that the provision of the charter above quoted is void because it is an attempt to invest a ministerial officer with powers and functions purely judicial.  This proposition is not, in our opinion, sustained by the authorities cited, or by any authority.  The provision in question does not seek to invest the auditor with any power to determine what the law is, or what the rights of any parties are with reference to any past transaction.  It merely requires the certificate of an officer peculiarly conversant with the fiscal affairs of the city that there are or will be available funds, or that available funds may lawfully be provided to meet any proposed expenditure, before the passage of an ordinance or resolution incurring the liability.  It is a restriction upon the legislative power of the council, consisting only in a requirement that they must go to the best source of information for the fact upon which their right to act depends.  It is easily conceivable that an arbitrary exercise by the auditor of the power so conferred might in particular instances be detrimental to the public interests, but so might the arbitrary exercise of an absolute or qualified veto by the mayor or other executive officer; and, since there is no constitutional objection to the conferring of a veto power upon the mayor, we can see no reason why a similar power with respect to a certain class of legislation may not be conferred upon the auditor of a municipal corporation.  But the appellant further contends that, notwithstanding the resolution was passed in the teeth of a prohibitory restriction in the charter, the city is nevertheless bound by the action of the mayor in executing the sublease, because the water company had the right to presume that the council would not have authorized the mayor to act without the proper certificate of the auditor.  This proposition, also, we think is unsustained by authority or reason.

It is no doubt true, as was said in *Moore v. Mayor, etc.,* 73 N. Y. 245, 29 Am. Rep. 134, that: "It is indispensable to any government, state or municipal, that full faith and credit be given to the acts of the governing body, and that individuals having occasion to deal with agents of the government should be permitted to regard the acts of the government valid in the absence of any apparent defect, either in the power or the manner of its exercise."  And upon this principle it may be conceded

that as to acts *in pais* which cannot appear upon the records of the proceedings, they will be presumed, so far as necessary, to sustain the action of municipal officers in matters falling within their general authority. But this is not a case for the application of the doctrine invoked. The mayor of San Diego had no authority, under the charter or other law of the state, to execute the contract in question. All the authority he had was derived from the resolution of the council, and the water company was bound to know that he could act only in pursuance of authority so conferred. They knew, in other words, that he was, for the purpose of executing that contract, the special agent of the city, and were bound to examine his warrant of attorney. If they had done so, they would have discovered its invalidity by mere inspection, because they must have seen that it did not bear the certificate which the law required to be indorsed upon it. The deficiency here was not merely of an act *in pais*, but was a defect of power, patent on the face of the writing which professed to confer it, and for this reason, also, we are of the opinion that the contract was void.

The further objection by counsel for respondents, that the resolution authorizing the mayor to execute the sublease was nugatory, because the council could only contract by ordinance, need not be noticed further than to say that no authority to proceed by joint resolution in such a matter has been called to our attention, and there is this material difference between the two proceedings, that an ordinance cannot take effect without publication, while a joint resolution is not subject to that condition. The resolution in question does not appear to have been published. The only authority conferred upon the council by the charter "to adopt, enter, and carry out means for securing a supply of water for the use of the city and its inhabitants" is found in the enumeration of matters as to which the council is empowered to pass ordinances. (Stats. 1889, p. 651, sec. 1; p. 653, sec. 29.)

The second ground upon which the superior court held the contract invalid was that it violated section 18, article XI, of the constitution, and the similar provisions of the city charter above quoted.

It was found that the sum of one hundred and ten thousand dollars per year could not have been paid out of the revenue pro-

vided for the city for the year in which the contract was made, or for any subsequent year. But this finding is attacked by the appellant, and the evidence clearly shows, without conflict, that the annual revenue of the city, exclusive of the amount collected from consumers of water, has been largely in excess of one hundred and ten thousand dollars, but that most of it has been expended for other purposes, so that the surplus was very much less than one hundred and ten thousand dollars. But there is nothing to show that the claims upon which the revenues were expended were valid claims, or for the necessary expenses of the city government. For aught that appears, the amount required to pay the rent may have been used to satisfy claims upon contracts entered into subsequent to the date of the lease. It is found, moreover, that a revenue sufficient to pay the necessary expenses of the city government and the rent of the water company could be raised by the levy of a tax not exceeding the charter limit of ninety cents on the hundred dollars.

In view of these findings, the conclusion of the superior court on this point evidently was not based upon the ground that a sufficient revenue to pay the rent could not have been provided year by year without transgressing the limitations of the taxing power imposed by the charter. In fact, it appears from the opinion of the superior judge that his conclusion was based upon a construction of the word "liability" as used in the constitution and charter, according to which a contract, extending over several years and providing for annual payments for services to be rendered or materials to be supplied from year to year, is void if the aggregate amount of all the payments that may become due under the contract from first to last exceeds the revenue of the city provided for the year in which the contract is made. That is to say, he held this lease for twenty years void because the aggregate rent for the whole period, two million two hundred thousand dollars, exceeded the revenues of 1891. This construction of the constitution is not without authority to support it, but most of the cases cited by the learned judge of the superior court in his opinion, and by counsel for respondents in his brief, are considered in the opinion of Justice Henshaw in *McBean v. Fresno*, 112 Cal. 159, 53 Am. St. Rep. 191, where it was held, in accordance with a conflicting line of decisions in other states and in this state, that a contract of a municipal gov-

ernment extending over several years is not rendered invalid by the fact that the aggregate amount to be paid during the whole period is in excess of the income provided for a single year, and that such a contract, so far as this particular objection is concerned, is valid if an income sufficient for the purpose may be provided in each year without exceeding the charter limit of taxation.

The opinion in that case also discusses another objection, which is made in a different form to the contract here in question., viz., that a contract, calling for services or supplies for a number of years beyond the term of office of the members of the council by whom it is made, is void, because it operates as a restraint or suspension of the legislative powers of the council. It is sufficient for our present purposes to say that we approve what was said in *McBean v. Fresno, supra,* with respect to this question, as well as the decision therein upon the point last above mentioned.

The remaining objections to the contract are without merit, and do not call for particular notice.

The result of the foregoing discussion is that the contract of the city with the water company is held invalid upon at least two grounds: 1. Because the city was led by the contrivance of the water company to agree to pay, under the name of rent, a subsidy to a railroad; and 2. Because the mayor had not sufficient authority to execute it on the part of the city.

This brings us to the proposition of appellant that, although the contract may have been invalid, the city is nevertheless estopped by its own conduct to deny its validity, at least in so far as it has been executed. The acts of the city most relied upon as creating such estoppel are, in addition to matters already stated, that the city required the water company, in pursuance of the terms of the sublease, to expend more than a hundred thousand dollars in extending its plant for supplying water to consumers, and refused to redeliver possession of the plant when demanded.

It is doubtful if the doctrine contended for by appellant could be sustained without setting aside previous decisions of this court, but this point need not be determined, for none of the decisions of other states go beyond the proposition that a municipal corporation may be estopped to deny the validity of a

contract which it had the general power to make, or to deny the validity of a contract, so far as executed, when the only objection to it is that it is for too long a term. But here one of the principal objections to this contract is that it contains a subsidy to a railroad, and is, therefore, beyond the power of the city and incapable of ratification directly or indirectly.

Our conclusion is, that there can be no recovery upon the express contract, even for the time the city kept possession of the water plant.

But the city had the general power to contract for a water supply for itself and its inhabitants, and under this power could undoubtedly have taken a lease of the water company's plant for a year, and could have renewed such lease from year to year. In effect it has done this very thing. Its express contract to pay nine thousand one hundred and sixty-six dollars and sixty-five cents was invalid for the reasons above stated, but there is no reason why it should not pay the reasonable value of the use of the plant which it has actually enjoyed. The decisions cited by counsel for appellant from the reports of other states very clearly sustain his contention in this respect, and so we think do the decisions of this court. We cite the following: *San Francisco Gas Light Co. v. Dunn*, 62 Cal. 580; opinion of Field, J., in *San Francisco Gas Co. v. San Francisco*, 9 Cal. 469; *Los Angeles Co. v. Los Angeles*, 65 Cal. 476; *Argenti v. San Francisco*, 16 Cal. 276 (opinion of Field, C. J.); *Zottman v. San Francisco*, 20 Cal. 96; 71 Am. Dec. 96.

We think the superior court erred in holding the city not liable on its implied contract to pay the value to it of the use of defendant's plant, as found in the thirty-eighth finding.

Counsel for appellant contends that the city is concluded by the allowance of the bills of the water company for the stipulated rent, and to sustain this proposition cites *San Francisco Gas Light Co. v. Dunn, supra; McFarland v. McCowen*, 98 Cal. 329, and other cases.

These cases are not in point, because they merely hold that the auditor, in *mandamus* to compel the drawing of his warrant for an allowed claim, cannot question the amount of the allowance. But here the city itself is contesting the claim, and is not precluded from showing that an amount allowed in pursuance of a void contract is in excess of reasonable value.

The claim that the city is liable for damages for withholding possession of the water plant, after demand made for its return, is not supported by any argument, and, since it is not pressed by counsel, we deem it sufficient to say that in view of the findings of the superior court and our conclusions upon the points above discussed, this position is not tenable.

For the reasons above stated, the judgment is reversed, and the cause remanded, with directions to the superior court to enter judgment upon the findings in favor of the water company for the reasonable value to the city of the use of the water company's plant during the time it was actually retained by the city, with authority to take additional evidence if necessary to ascertain the exact sums payable for the different fiscal years, said sums to be made payable out of the revenues of the fiscal years during which they respectively accrued, according to the suggestion made as to the proper form of such judgments in *Weaver v. San Francisco*, 111 Cal. 319.

McFarland, J., Henshaw, J., and Temple, J., concurred.

HARRISON, J., dissenting.—I dissent, and if my duties will permit will hereafter file an opinion expressing the grounds of my dissent.